# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br>525 East Cotati Avenue<br>Cotati, CA 94931,<br><br>               Plaintiff,<br><br>v.<br><br>THOMAS VILSACK, SECRETARY,<br>United States Department of Agriculture,<br>1400 Independence Avenue SW<br>Washington, DC 20250, and<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE,<br>4700 River Road<br>Riverdale, MD 20737,<br><br>               Defendants. | Case No. 21-cv-623<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This is a case under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), challenging a decision by the Defendant U.S. Department of Agriculture ("USDA") to renew the Animal Welfare Act ("AWA") license of Robert Sawmiller d/b/a Wildlife on Wheels ("Sawmiller"), despite Sawmiller's repeated and ongoing violations of the relevant AWA standards, the numerous animal deaths at Sawmiller's facilities, and Sawmiller's inability to comply with all applicable standards.

2.      As part of the AWA license renewal process, Sawmiller was required to certify that it is "in compliance with the regulations and standards" of the AWA. 9 C.F.R. § 2.2(b). This self-certification, combined with USDA's ability to inspect, *id.* § 2.3(a), is how the agency ensures that a license renewal applicant has "demonstrated that his facilities comply with" the AWA. *See* 7 U.S.C. § 2133.

3.      As set forth in more detail below, USDA also ignored its own regulations in treating the application by Sawmiller as a renewal. Sawmiller was required to submit a timely

application to renew its license prior to the license expiring, but failed to do so. Instead of requiring that Sawmiller comply with the foregoing requirement, the USDA ignored its own regulations when it granted Sawmiller a license as if Sawmiller had made a timely application to renew the license.

4.      On information and belief, as part of a belated application to renew its license as part of the 2020 renewal application, Sawmiller certified that its facilities were compliant with the AWA, and as a result the USDA renewed Sawmiller's AWA license.

5.      As a result of USDA's actions, Sawmiller currently holds an "active" AWA license.

6.      At the time of its renewal decision, USDA knew or should have known, based on the records before it, that Sawmiller's self-certification of compliance with the AWA was false. In June 2020, ALDF sent USDA a package of information and evidence of Sawmiller's continuing, chronic violations of the AWA, including evidence showing how Sawmiller is causing its animals to suffer severe psychological distress, physical injuries, and even death.

7.      ALDF's package included the most recent USDA inspection prior to Sawmiller's license renewal, from March 4, 2020. That inspection report, known to USDA when it renewed the license, documented nineteen (19) total non-compliances with AWA regulations. Eleven (11) non-compliances were "repeat" and three (3) were "direct." Direct non-compliances are the most serious violations within an inspection report.

8.      USDA's March 4, 2020 inspection reports detail how Sawmiller's AWA violations led to widespread animal suffering and multiple animal deaths. For instance, when Sawmiller transported brown bears from Iowa to one of its facilities, it killed two bears from transportation stress. USDA also cited Sawmiller for housing brown bear cubs and cougars next to each other without any visual separation, causing a cougar to exhibit stress by pacing back and forth with his face grating against wire paneling. The pacing and face rubbing created "two open, reddened and raw, approximately 1/2" in diameter, hairless patches on either side of [his] face."

9.      Moreover, since 2010, USDA has issued Sawmiller dozens of other non-compliances and multiple official warnings of AWA violations.

10.     USDA has also documented the suffering of animals confined by Sawmiller to barren, cramped, unsafe, and feces-laden enclosures, often without clean water, adequate nutrition, protection from the elements, or proper veterinary care—all in violation of the AWA.

11.     USDA chose to ignore ALDF's letter and package of evidence, including USDA's own documented violations, which demonstrated Sawmiller's consistent and longstanding noncompliance with the AWA when the agency renewed Sawmiller's license.

12.     In response to a public records request, USDA told ALDF on October 1, 2020, that Sawmiller "has not submitted an application for a license for year 2020," and "according to [the USDA] database, the license expired 7/14/2020." USDA further stated that it had not received any license renewal applications from Sawmiller between July 15 and September 14, 2020.

13.     Despite USDA's assertion that the Sawmiller license expired, the USDA's public database now shows Sawmiller on its list of active licensees. The active licensee list, updated January 25, 2021, shows that Sawmiller's license now has an expiration date of July 14, 2021.

14.     In late January and February 2021, USDA inspected Sawmiller's Indiana facility, finding several violations of the AWA, including a black bear with snowballs hanging from her coat and bears in "a state of unrelieved suffering" because of inadequate shelter from the cold.

15.     Thus, sometime in late 2020 or early 2021, USDA renewed Sawmiller's license despite evidence that Sawmiller's self-certification was blatantly false, and despite knowing that Sawmiller's facilities were grossly and consistently out of compliance with the AWA. As such, USDA's decision to renew the AWA license for Sawmiller was arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations within the meaning of the APA.

16.     The AWA's purpose is "to insure that animals used . . . for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 21313(1). By automatically granting Sawmiller's license renewal application, USDA is condemning several animals, including species protected by the Endangered Species Act ("ESA"), to suffer for years on end without the food, water, enrichment, or veterinary care to which they are entitled under the AWA.

## JURISDICTION, VENUE, AND RELIEF

17.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 because this action constitutes a federal question under the APA, 5 U.S.C. §§ 551-801, and the AWA, 7 U.S.C. §§ 2131-59.

18.     Venue is proper in this Court under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e). Defendant USDA is headquartered in the District of Columbia.

19.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Injunctive relief is authorized by Federal Rule of Civil Procedure 65 and the APA, 5 U.S.C. § 706.

## PARTIES

### Plaintiff

20.     Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a national animal advocacy non-profit headquartered in Cotati, California, with over 300,000 members.

21.     ALDF pursues its mission of "protecting the lives and advancing the interests of animals" by advocating against cruelty to animals and advocating for the protection of animals used in commercial enterprises. ALDF frequently focuses its resources on advocating for increased protections of animals used for entertainment and exhibition purposes. ALDF has spent significant organizational resources on advocacy and public education efforts to improve the welfare of wild and exotic animals held in captivity, particularly those held for exhibition and entertainment. ALDF routinely submits comments to different agencies of federal government— including USDA and U.S. Fish and Wildlife Service—concerning the import, transfer, and treatment of captive animals. ALDF has an organizational public campaign in which it regularly opposes industry requests for permits to breed, transfer, and cull captive wild animals. ALDF, "Issue: Stop the Hunt," *at* https://aldf.org/issue/stop-the-hunt/ (last visited Aug. 25, 2020). ALDF also offers several webinars a year discussing the care, conditions, and regulatory protections of animals at roadside zoos and other exhibitors licensed under the AWA. *E.g.*, ALDF, "Protecting Big Cats" Webinar, *at* https://aldf.org/article/protecting-big-cats/ (presented July 23, 2020). Similarly, ALDF is also releasing a series of white papers about how animal exploitation, including the trade of wildlife for animal exhibition, increases the risk of zoonotic diseases like

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Covid-19. *See* ALDF, "COVID-19 and animals," *at* https://aldf.org/wp-content/uploads/2020/06/White-Paper-COVID-19-and-Animals.pdf (June 2020).

22.     USDA's decision to renew Sawmiller's license contradicts ALDF's mission. By renewing Sawmiller's license, USDA not only ignores its own regulations regarding renewals, but allows Sawmiller to exhibit, deal, and otherwise exploit animals under inhumane conditions that do not meet the minimum standards of care and treatment under the AWA. As a result, ALDF is compelled to spend more resources uncovering, detecting, educating the public about, and bringing to the agency's attention, the ongoing harms to animals at Sawmiller's non-compliant facilities.

23.     ALDF has spent considerable resources working to protect the animals confined at Sawmiller's facilities. ALDF has documented and assessed the conditions of the Sawmiller animals and will continue to do so. For example, ALDF complained to USDA documenting Sawmiller's violations of the AWA and the ESA, and those effects on the subject animals. In 2020, ALDF also subpoenaed Sawmiller to learn about how it supplied captive wildlife to defendants in one of ALDF's ongoing lawsuits; when Sawmiller failed to respond to the subpoena, ALDF sought and received monetary sanctions. Sawmiller would not pay ALDF the money judgment, causing ALDF to divert time and resources from pursuing its mission to spend in excess of $3,000 of staff time and resources to seek—and receive—a federal court's writ of execution to seize a few of the many suffering animals at Sawmiller's Ohio facility. ALDF then spent over a dozen hours of staff time and significant sums of money organizing and carrying out the seizure of two wolves and one breeding dog, including time spent finding and ensuring the attendance of a veterinarian and other animal rescue staff, and payments for the required presence of U.S. Marshals. While on site performing the rescue, ALDF observed the inhumane conditions in which Sawmiller was keeping its animals: the animals' chain-link cages were broken with sharp wires poking out, their water bowls were frozen in the mid-afternoon, and lying in the back of the cages were piles of carcasses of unknown animals. Horrified by the observations, on January 13, 2021, ALDF filed a complaint with the Ohio Department of

Agriculture, describing in detail the conditions and asking the agency to investigate Sawmiller's

Ohio facility and to seize the remaining animals and transfer them to sanctuary.

24.     ALDF's campaign to protect captive wild animals held at roadside zoos, including

its process of submitting complaints to USDA regarding violations of the AWA, is hindered by

USDA's arbitrary and capricious decision-making. By relying on Sawmiller's self-certification

of compliance, USDA willfully ignored ALDF's evidence of AWA violations and limited the

effectiveness of ALDF's investigation, monitoring, and complaint. As a result, ALDF has been

forced to turn to other means to pursue humane treatment of animals at Sawmiller's facilities,

including continued monitoring and submitting complaints to state agencies and local law

enforcement and seeking a writ of execution to protect Sawmiller's animals.

25.     As a result of USDA's unlawful decision to renew Sawmiller's license, ALDF

must divert resources away from other projects to protect animals—including animals living at

other exhibitors' facilities—in order to combat USDA's misunderstanding and misapplication of

the AWA. ALDF must also combat Sawmiller's ongoing, chronic violations of the AWA and

related state and federal laws, and simultaneously educate the public about the unlawful and

inhumane way in which Sawmiller maintains the animals at its facilities.

26.     If ALDF prevails here, it can stop diverting resources to address USDA's

unlawful failure to require that Sawmiller comply with AWA. A vacatur of the agency's license

renewal approval will force Sawmiller to transfer the animals to another facility, which will

better care for the animals. Sawmiller's animals would live in lawful conditions that better

protect the animals, and thus would not cause ALDF to divert resources.

27.     ALDF also brings this action on behalf of its members, who have established an

aesthetic and emotional connection to several of the animals at Sawmiller's facilities. These

interests are harmed by USDA's unlawful decision to renew Sawmiller's AWA license, which

allows Sawmiller to continue treating all the animals at its facilities inhumanely, which, in turn

adversely affects ALDF's members' relationship with them.

28.     ALDF's members' aesthetic, emotional, and educational interests will be

redressed if ALDF prevails because a vacatur of the agency's license renewal approval will force

Sawmiller to transfer the animals to another facility, which will better care for the animals. ALDF members with aesthetic interests in observing the animals will visit them and enjoy the animals living under much more humane conditions.

29.     Tracey Kuehl ("Tracey") is a member of ALDF. From her earliest memories of caring for cows and pigs on her family's Iowa farm, she has felt a strong sense of respect, stewardship, and love for animals.

30.     Tracey derives personal, recreational, educational, and aesthetic value from being in the presence of animals and observing animals in humane conditions. She has visited nearly every zoo within 300 miles of the Quad Cities because of her personal, recreational, educational, and aesthetic interest in observing animals that she knows she will never have the opportunity to see in the wild, and because she believes zoos are enjoyable places to go with her friends. Tracey suffers personal distress when she witnesses animals in conditions that physically or psychologically harm the animals or are otherwise inhumane.

31.     Because of her interest in observing animals, Tracey visited CHZ in June 2012. Among other neglectful conditions, she observed bears kept in a small corncrib cage that was dirty and contained standing water and piled up feces. Based on what she saw, Tracey was severely distressed by what she had observed, and was haunted by the need to help the animals.

32.     Tracey began spending significant time trying to improve the CHZ animals' situation. She submitted several complaints about their welfare to USDA, state agriculture inspectors, and the local sheriff. And with co-plaintiffs ALDF and her sister, Lisa Kuehl, Tracey filed a number of lawsuits to protect CHZ animals. During the pendency of those suits, Tracey and Lisa learned that in 2016 Sawmiller lent five bears to CHZ, for CHZ to exhibit and breed. CHZ would send back to Sawmiller the bear cubs that the adult bears produced.

33.     Tracey saw many pictures of the bears on loan from Sawmiller living at CHZ. The following photograph is a picture of a Sawmiller-loaned bear in one of the severely restrictive corncrib cages at CHZ; the exact cage that Ms. Kuehl was previously disturbed to have observed housing large mammals.



34.     Some of the bears were living in other tiny enclosures that Tracey had previously observed in person during her visits. She was saddened to see more animals suffering from the CHZ conditions.

35.     In 2018, Tracey, her sister Lisa Kuehl, and others, including another ALDF member, sued CHZ under a public nuisance theory in Iowa court, seeking, *inter alia*, an order requiring CHZ to send all its animals to approved sanctuaries. Tracey and Lisa and their co-petitioners prevailed in their Iowa state court action.

36.     The Iowa court ordered that all the exotic animals at CHZ be removed to sanctuary immediately according to arrangements made by the petitioners and their agents. Expressly identified in the court's removal order were seven brown and black bears.

37.     However, the day before the removal to sanctuary was slated to occur, Tracey discovered that the five brown bears were mysteriously no longer at CHZ.

38.     Tracey was distraught and upset. She immediately worried over where the bears went and lamented that she could no longer ensure the bears live out their lives in safe and humane conditions. Nor could she visit and observe the bears at a sanctuary, as she had planned and expected.

39.     Tracey later discovered that Sawmiller had swooped in before ALDF arrived to carry out the removal and whisked away the five bears with whom she had developed strong emotional and aesthetic connections.

40.     Tracey then learned from a USDA inspection report that of the five adult bears transported from CHZ to Sawmiller, two died from "transportation stress."

41.     The three remaining bears continue to suffer at under Sawmiller's control at Sawmiller's facilities where USDA inspection reports detail the inhumane treatment of all animals, including the bears.

42.     Tracey was furious about Sawmiller's interference with the relief she received from the Iowa court. Adding to her aesthetic and emotional injuries, she learned from a USDA inspection report that of the five adult bears Sawmiller removed from CHZ, two died during transportation. The three remaining bears continue to suffer at Sawmiller's facilities.

43.     USDA's unlawful decision to renew Sawmiller's AWA license, which allows Sawmiller to keep the CHZ bears in harmful conditions, causes Tracey's injuries. This Court will redress her harms if it sets aside USDA's decision to renew Sawmiller's license. Without an AWA license, Sawmiller will have to transfer the animals to another facility—like a zoo or sanctuary—that would provide humane care. Sawmiller would not be able to possess the bears at its facilities in Indiana or Ohio without a USDA-issued AWA license.

44.     Tracey has visited other animals rescued from CHZ, and if the brown bears from CHZ (and now with Sawmiller) were transferred to a facility that properly cared for the bears, she would make every effort to travel to visit them.

45.     Lisa Kuehl ("Lisa") is a member of ALDF. Like her sister Tracey, from her youngest memories of growing up on an Iowa farm in which she had both farmed animals and pets, she has felt a deep sense of respect, stewardship, and love for animals.

46.     In June 2012, Lisa first visited CHZ and experienced distress and anguish from the conditions that she observed there. Because she cared about the animals at CHZ and was concerned about their health and welfare, she dedicated time to improving their situation.

47.     In addition to her complaints to USDA, state agencies, and the local sheriff about the conditions of the CHZ animals, Lisa (and many others, including Tracey and ALDF) filed several lawsuits against CHZ. Through these lawsuits, Lisa learned that in 2016, Sawmiller lent CHZ five bears for exhibition and breeding purposes.

48.     As explained above, after Lisa and her co-petitioners won a public nuisance lawsuit in Iowa state court, the judge ordered the removal of all the exotic animals at CHZ. But before the petitioners and their agents could carry out the rescue, Sawmiller removed at least five bears and transported them back to its facilities.

49.     Lisa was irritated beyond belief and distraught. She was immediately concerned about the bears' new confinement and was disheartened to know she could no longer ensure the bears' safety and care as she thought she would. Adding to her distress, she learned from a USDA inspection report that of the five adult bears Sawmiller removed from CHZ, two died during transportation, and that the three other bears continue to suffer at Sawmiller's facilities.

50.     USDA's decision to renew Sawmiller's AWA license, which allows Sawmiller to keep the CHZ bears in harmful conditions, causes Lisa emotional and aesthetic injuries. This Court will redress the injuries if it sets aside USDA's decision to renew Sawmiller's license. Without an AWA license, Sawmiller will have to transfer the animals to a facility that would provide humane care. Sawmiller would not be able to possess the bears at its facilities in Indiana or Ohio without a USDA-issued AWA license.

51.     Lisa has visited other animals rescued from CHZ and moved to safe haven, and if the brown bears from CHZ (and now with Sawmiller) were transferred to a facility that properly cared for the bears, she would make every effort to visit them.

**Defendants**

52.     THOMAS VILSACK is the Secretary of Agriculture and is responsible for administering the AWA. Secretary Vilsack is ultimately responsible for the agency's decision to renew Sawmiller's AWA license.

53.     The UNITED STATES DEPARTMENT OF AGRICULTURE is the agency responsible for administering the AWA and ensuring the humane care and treatment of animals that are used for exhibition. USDA is the federal agency that rubberstamped the 2020 (or early 2021) renewal of Sawmiller's license despite its chronic AWA violations.

## LEGAL FRAMEWORK

### The Animal Welfare Act

54.     The primary purpose of the AWA is to "insure that animals intended for use . . . for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 2131(1).

55.     To accomplish this purpose, Congress directed the Secretary of Agriculture to promulgate standards for the "humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *Id*. § 2143(a)(1). The standards must include "minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, [and] adequate veterinary care." *Id.* § 2143(a)(2)(A).

56.     No one may engage in the regulated activity of exhibiting animals "unless and until such dealer or exhibitor shall have obtained a license." 7 U.S.C. § 2134.

57.     Under the AWA, the Secretary "shall issue licenses" to dealers and exhibitors, "*[p]rovided* that no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary" pursuant to the Act. *Id.* § 2133 (emphasis in original).

58.     Every AWA license has an expiration date. Under the regulations in effect on July 14, 2020, when Sawmiller's license expired, AWA licenses expire annually and must be renewed on or before the expiration date. Each AWA license "will expire and automatically terminate" on its expiration date. 9 C.F.R. § 2.5(b) (July 2020). "A licensee who wishes a renewal must submit . . . a completed application form . . . on or before the expiration date of the license." *Id.* § 2.1(d)(1). This process repeats "[e]ach year" and licensees must file renewal applications "within 30 days prior to the expiration date" of the license to avoid expiration and automatic termination. *Id.* § 2.7(a). Once a license expires without renewal, or terminates, a facility must go through a new process to acquire a new license.

59.     An applicant seeking to renew its AWA license must submit both "a completed application form and the annual license fee." *Id.* § 2.1(d)(1).

60.     Applicants for renewal, like applicants for an initial license, "must demonstrate" compliance with the AWA. *Id.* § 2.3(a); *see also* 7 U.S.C. § 2133 ("no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply" with the AWA); APHIS Form 7003 (Application for License Renewal, stating "No license may be issued unless a completed application has been received (7 U.S.C. 2132-2143), and the applicant is in compliance with the standards and regulations Section 2133").

61.     According to regulations in effect on July 14, 2020, applicants for an initial license "must be inspected" by USDA to demonstrate compliance with the AWA. 9 C.F.R. § 2.3(b) (July 2020). License renewal applicants, in contrast, are required only to make their "animals, premises, facilities, vehicles, equipment, other premises, and records available for inspection" to allow USDA to "ascertain the applicant's compliance" with the AWA. *Id.* § 2.3(a).

62.     USDA often relies on a renewal applicant's certification that "to the best of the applicant's knowledge and belief, he or she is in compliance with the [AWA] regulations and standards," *id.* § 2.2(b), to ensure a demonstration of compliance with AWA standards. This self-certification is simply the applicant's signature on the renewal application form. *Id.*

63.     Yet USDA has stated that this self-certification requirement is *not* intended as an "alternative means of ascertaining compliance" with the AWA. *See* 60 Fed. Reg. 13893, 13894 (Mar. 15, 1995). Rather, facilities are subject to inspections during which USDA can "ascertain the applicant's compliance with the [AWA] standards and regulations." *Id.* USDA inspects licensed facilities routinely to determine compliance with the AWA. 9 C.F.R. §§ 2.126, 2.3(a) (July 2020).

64.     Once issued, an AWA license is "valid and effective" for one year unless it is "revoked or suspended," "voluntarily terminated," it "has expired or been terminated," or the "annual license fee has not been paid . . . as required." *Id.* § 2.5(a).

65.     Under newly issued regulations, effective November 9, 2020, "Any person who seeks the reinstatement of a license that has expired or been terminated must follow the procedure applicable to new applicants for a license set forth in § 2.1." 9 C.F.R. § 2.5(b) (Nov.

2020). New applicants must submit comprehensive information to USDA, acknowledge their understanding of the AWA regulations and standards and agree to comply with the standards, and demonstrate compliance with the AWA through three pre-license inspections. *Id.* §§ 2.1-2.3.

66.     A person or facility whose license is revoked is permanently disqualified from becoming licensed again. 9 C.F.R. § 2.10(b) (July 2020). A person or facility whose license is suspended may apply for reinstatement after the suspension has expired. *Id.* In contrast, a person or facility whose license is not renewed may reapply for a license at any time.

67.     "The failure of any person to comply with any provision of the Act, or any of the provisions of the regulations or standards" promulgated pursuant to the Act "shall constitute grounds for denial of the license" application. *Id.* § 2.1(e).

68.     In addition, "[a] license will not be issued to any applicant who . . . has been found to have violated any Federal, State, or local laws or regulations pertaining to the transportation, ownership, neglect, or welfare of animals." *Id.* § 2.11(a)(6).

### Relevant Animal Welfare Act Standards

69.     The following is a non-exhaustive list of AWA standards governing facilities like Sawmiller. All standards promulgated pursuant to AWA are located at 9 C.F.R. parts 2 and 3.

**A.     Attending Veterinarian and Adequate Veterinary Care Standards**

70.     Veterinary care standards for animals maintained by licensees are set forth at 9 C.F.R. § 2.40. These regulations require, *inter alia*, that exhibitors have "an attending veterinarian who shall provide adequate veterinary care" to the animals they maintain. *Id.*

71.     Each exhibitor must also "establish and maintain programs of adequate veterinary care that include . . . [t]he use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care [and] [d]aily observation of all animals to assess their health and well-being[.]" *Id.* § 2.40(b)(2), (3).

**B.     Inspection of Property and Records and Submission of Itineraries**

72.     During business hours, every exhibitor must allow APHIS officials to enter the property, examine and make copies of records, inspect and photograph the facilities, property,

and animals, and document any noncompliances. *Id.* § 2.126(a). A responsible adult must be available to accompany APHIS officials during the inspection process *Id.* § 2.126(b).

73.     Whenever an exhibitor travels overnight to exhibit an animal, it must submit a written itinerary to USDA prior to the travel. *Id.* § 2.126(c). The itinerary must include: 1) the name of the person exhibiting and transporting the animal, 2) the name, identification number or identifying characteristics, species, sex, and age of each animal, and 3) the names, dates, and locations where the animals will travel, be housed, and be exhibited. *Id.*

**C.     Handling of Animals**

74.     "All licensees who maintain wild or exotic animals must demonstrate adequate experience and knowledge of the species they maintain." *Id.* § 2.131(a). In addition, exhibitors must handle every animal as "expeditiously and carefully as possible in a manner that does not cause trauma, overheating, excessive cooling, behavioral stress, physical harm, or unnecessary discomfort." *Id.* § 2.131(b)(1).

**D.     Facilities and Operating Standards**

75.     All animal housing facilities must have a structure that not only contains the animals, but "protect[s] the animals from injury[.]" *Id.* § 3.125(a).

76.     Outdoor enclosures must have appropriate shelter to protect animals from direct sunlight and inclement weather. *Id.* § 3.127(a), (b). Enclosures must also have a perimeter fence that protects animals by restricting unauthorized humans or animals from entering the enclosures and contains dangerous animals from escaping. *Id.* § 3.127(d).

77.     Enclosures must provide sufficient space to allow each animal to make normal posture and social adjustments; inadequate space may be indicated by "evidence of malnutrition, poor condition, debility, stress, or abnormal behavior patterns." *Id.* § 3.128.

**E.     Animal Health and Husbandry Standards**

78.     Food must be wholesome, palatable, free from contamination, and sufficient to ensure all animals have good health, and exhibitors should feed animals at least once a day unless otherwise necessary for hibernation, veterinary treatment, or other accepted practices. *Id.* § 3.129(a). Each animal's diet must be appropriate for the animal's age, species, condition, size,

and type. *Id.* Food receptacles must be accessible to all animals in an enclosure, and they must be kept clean and sanitary at all times. *Id.* § 3.129(b).

79.     Potable water must either be "accessible to the animals at all times" or provided "as often as necessary for the health and comfort of the animal," and water receptacles must be kept clean and sanitized. *Id.* § 3.130.

80.     Exhibitors must remove feces from primary enclosures as often as necessary to prevent animal contamination, minimize disease hazards, and reduce odors. *Id.* § 3.131(a).

81.     Animals housed together must be compatible. *Id.* § 3.133. In addition, animals "shall not be housed near animals that interfere with their health or cause them discomfort." *Id.*

**F.     Transportation Standards**

82.     An exhibitor may not transport any live animal unless, *inter alia*, the transported enclosure has sufficient structural strength to contain the animals and to withstand the rigors of transportation and the interior has no protrusions that could injure the animals. *Id.* § 3.137(a).

83.     The transporter must "assure that [the live animals] are receiving sufficient air for normal breathing, their ambient temperatures are within the prescribed limits, all other applicable standards are being complied with and . . . determine whether any of the live animals are in obvious distress and to provide any needed veterinary care as soon as possible." *Id.* § 3.140(a).

**The Administrative Procedure Act**

84.     The APA requires courts to "set aside agency action" that is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

85.     "Agency action" includes "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(12); *see also id.* § 701(2).

86.     Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

**FACTS**

87.     Sawmiller is a traveling menagerie, along with one facility located at 16761 County Road 25a, Wapakoneta, OH 45895 and at least one other facility at an unknown address in Indiana. Sawmiller confines, exhibits, and deals in many species of wildlife and other animals, including but not limited to bears, wolves, cougars, coyotes, foxes, and badgers.

88.     USDA has designated Sawmiller as a Class C Exhibitor. Sawmiller previously held AWA exhibitor license 31-C-0083 but is now operating under AWA exhibitor license 31-C-0221. USDA has renewed Sawmiller's license every year since at least 2014.

89.     Nearly all enclosures at Sawmiller's facilities and those used for transportation are poorly maintained. Sawmiller's enclosures are structurally impaired; undersized; contain unsanitary and dangerous food receptacles, excessive feces build-up, and dangerously sharp metal and rust; fail to provide adequate shelter from the elements, fail to provide clean drinking water; and fail to provide adequate enrichment objects and structures for the animals.

90.     Sawmiller routinely violates the AWA because of its inability to maintain the enclosures, provide proper husbandry, and give care to the animals it houses and transports.

91.     Some animals kept by Sawmiller are members of species listed as endangered or threatened under the ESA. By keeping listed animals in conditions that fall well short of AWA standards and cause physical and psychological injury to the animals, Sawmiller violates the ESA. In addition, Sawmiller is violating the ESA by repeatedly transferring ESA-listed animals across state lines for commercial purposes.

92.     Sawmiller failed to file a timely application to renew its license.

93.     As a result, the AWA license expired on July 14, 2020.

94.     On information and belief, in late 2020 or early 2021, Sawmiller applied for a renewal of the license that expired. As set forth above, because Sawmiller's license had terminated, it was required to comply with all requirements applicable to an initial license.

95.     On information and belief, USDA renewed Sawmiller's license in late 2020 or early 2021 without requiring that Sawmiller comply with the requirements applicable to the initial grant of a license.

96.     USDA's public online database identifies Sawmiller as an exhibitor with an "active" AWA license for the license number 31-C-0083.

97.     USDA had no reason to suspect that Sawmiller's chronic violations of the AWA had ended when Sawmiller submitted its license renewal application.

98.     Indeed, USDA had actual knowledge that any Sawmiller self-certification of compliance with AWA standards was false.

99.     On June 10, 2020, ALDF sent USDA a package of information and evidence of Sawmiller's continuing, chronic violations of the AWA, including evidence showing how Sawmiller is causing its animals to suffer severe psychological distress, physical injuries, and even death. The package included a six-page letter explaining that USDA should not renew Sawmiller's license because Sawmiller is not anywhere close to compliance with the AWA, and because it has illegally trafficked wildlife in violation of the ESA. ALDF attached 186 pages of exhibits supporting its explanation, including USDA inspection reports. One attached inspection report was from USDA's most recent inspection on March 4, 2020.

100.    On March 4, 2020, USDA inspectors cited Sawmiller for nineteen (19) violations of AWA standards, including eleven (11) repeat violations and three (3) direct violations. "Direct" violations are those that, at the time of the inspection, seriously or severely adversely impact an animal's health or welfare, or are likely to have that effect in the immediate future.

101.    Two of the direct violations arose from Sawmiller's failure to provide adequate veterinary care. The USDA inspectors identified two animals with injuries that were not even known to Sawmiller until the inspectors pointed them out.

102.    The first was a brown bear suffering a cut on her lower lip with accompanying blood stains on her enclosure's floor. The inspectors observed the bear playing with and chewing on an "old metal water receptacle with sharp, jagged edges," which likely caused her bloody cut.

103.    The second injured animal was a cougar who had "two open, reddened and raw, approximately 1/2" diameter hairless patches on either side of [his] face." The inspectors noted that the cougar was "repeatedly pacing the sides of the enclosure with [his] face brushing up against the welded wire panel enclosure fencing," which may have caused the injury. The

inspectors believed the cougar's pacing was a behavioral expression of stress, and that Sawmiller caused the stress by housing the cougar immediately next to—and within direct view of—other predators, including another cougar and brown bears.

104.     For both injured animals, the inspectors reported Sawmiller as noncompliant for failing to use the appropriate methods to prevent, control, diagnose, and treat diseases and injuries. The inspectors also found Sawmiller failed to provide daily observation of all animals, as Sawmiller was unaware of the animals' wounds until the inspectors pointed them out.

105.     The third direct violation from the March 4, 2020 inspection was for Sawmiller's inappropriate and harmful handling of animals. The inspectors reported that Sawmiller handled animals in a way that causes trauma, behavioral stress, physical harm, or unnecessary discomfort. For instance, Sawmiller told the inspectors that "two of the brown bears that he transported from Iowa to his facility in Indiana died shortly after arrival at the Indiana facility," and that "the cause of the animals' deaths was due to transportation stress."

106.     In addition to the direct violations, the March 4, 2020 inspection also resulted in eleven "repeat" violations. These include, *inter alia*, failure to maintain records for animals, failure to provide shade shelters, failure to keep enclosures free from rusty and sharp metal, unsanitary and dangerous food receptacles, failure to provide clean drinking water, and excessive feces and old bones in enclosures.

107.     The March 4, 2020 inspection report noted five new violations, including failure to maintain records for the unknown number of animals recently acquired, failure to maintain records for the deaths of several animals, failure to maintain a fox enclosure in good repair, and failure to provide bedding for a coyote. In addition, Sawmiller kept "no record of the species and number of animals that were transported and transferred from a facility in Iowa to his facility."

108.     On information and belief, CHZ is the "facility in Iowa" referenced in the March 4, 2020 inspection report.

109.     On information and belief, Sawmiller transported at least five brown bears from CHZ to its facilities.

110.    The non-compliances identified in the March 4, 2020 inspection report were not unusual for Sawmiller. For at least a decade, USDA has consistently issued several citations to Sawmiller for numerous violations of the AWA and its regulations.

111.    USDA inspected or attempted to inspect Sawmiller at least six other times during 2019 and 2020. These inspections resulted in a total of twenty (20) non-compliances with the AWA and its regulations.

112.    In 2016, Sawmiller was cited for its failure to feed the bears and the cougar proper diets, which most likely caused one bear to be underweight. In 2018, Sawmiller was cited after it housed two newly acquired cougars in the same enclosure, though they had never been housed together, which resulted in one cougar killing the other.

113.    Since 2014, USDA has inspected or attempted to inspect Sawmiller at least twenty (20) times. Thirteen (13) of these inspections found at least one noncompliance with AWA standards. These violations include, *inter alia*, transferring animals to and from unlicensed, unapproved, and unknown facilities; failure to provide clean drinking water; unsanitary and dangerous food receptacles; failure to provide sufficient space, shelter from the elements, climbing structures, and enrichment; dangerously sharp metal and rust present in animal enclosures, excessive feces build-up in enclosures; and the regular inability of a responsible adult to arrive at the facility during business hours to allow a USDA official to conduct an inspection.

114.    In 2011, USDA issued Sawmiller an Official Warning for serious violations identified during an inspection in December 2010. One year later, in January 2012, USDA issued Sawmiller another Official Warning for serious violations identified during inspections occurring between January and March 2011.[1]

115.    Despite Sawmiller's persistent violations of the AWA, and USDA's awareness of such persistent violations, USDA denied ALDF's letter request that the agency deny Sawmiller's

---

[1] An "Official Warning" is a USDA administrative enforcement action. "Depending on the case, an inspection report may prompt a formal investigation, and these formal investigations can lead to issuing an official warning letter." *ALDF v. USDA*, 935 F.3d 858, 864 n.5 (9th Cir. 2019).

2020 AWA license application. In its response to ALDF, USDA disavowed that it would even consider the recurring AWA non-compliances, resulting animal deaths, and other smoking gun information occurring at Sawmiller's facility that ALDF included in its package for USDA. On June 17, 2020, USDA wrote to ALDF, "if [Sawmiller] has satisfied the administrative requirement for renewal, the license will be renewed."

116.    On October 1, 2020, USDA wrote to ALDF to explain that "Robert Sawmiller, Wildlife on Wheels does not/has not submitted an application for a license for year 2020," and the agency confirmed that "according to their database, the license expired 7/14/2020."

117.    USDA further explained that for the Sawmiller license, "[t]here were no supporting documentation or applications on file for 2020 or 7/15/2020-09/14/2020."

118.    Under the regulations in place in July 2020, Sawmiller needed to "file an application for a license renewal and an annual report form . . . and pay the required annual license fee." If Sawmiller did not submit the forms and fee "on or before the expiration date of the license," it would "result in automatic termination of the license." 9 C.F.R. § 2.5(b) (July 2020).

119.    If Sawmiller sought "the reinstatement of a license that has been automatically terminated," it was required to "follow the procedure applicable to new applicants for a license." *Id*. § 2.5(c).

120.    At that point, Sawmiller was required to re-apply for an "initial license" through a process in which Sawmiller had to "demonstrate compliance with the regulations and standards" through a pre-inspection process. *Id*. § 2.3(b).

121.    Sawmiller currently has an active license that is the same number as his license from 2019.

122.    In late January and February 2021, USDA undertook several inspections of brown bears and black bears at Sawmiller's Indiana facility. The February 1, 2021 inspection report references Sawmiller's license number 31-C-0221, indicating that Sawmiller is operating under a license renewal and not a new license. The inspection report, occurring after two inspections finding violations the week prior, still identified two "direct" and one repeat non-compliance.

One of the directs concerned a brown bear cub in "poor body condition" in "a state of unrelieved suffering" because of inadequate insulated shelter from the cold.

123.    USDA therefore renewed Sawmiller's license even though, according to USDA itself, the license had expired and automatically terminated.

124.    On information and belief, USDA did not require Sawmiller to re-apply for a license under the "procedure applicable to new applicants for a license."

125.    Based on past practice, USDA will likely continue to renew Sawmiller's license, even if Sawmiller continues to chronically violate AWA standards.

## CLAIMS FOR RELIEF

### Claim One: Challenge to the Late 2020 or Early 2021 License Renewal Decision

126.    Each and every allegation set forth above is incorporated herein by reference.

127.    In making the most recent decision to renew Sawmiller's license despite Sawmiller's chronic failure to comply with the AWA and its implementing regulations, USDA acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

128.    The late 2020 or early 2021 decision to renew Sawmiller's AWA license exceeds Defendants' statutory jurisdiction and authority, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(C).

129.    Defendants' unlawful actions injure Plaintiff in the manner specified in the allegations set forth above.

### Claim Two: Challenge to Pattern and Practice of License Renewal Decisions

130.    Each and every allegation set forth above is incorporated herein by reference.

131.    USDA's pattern and practice of routinely renewing Sawmiller's AWA license each and every year despite Sawmiller's flagrant and persistent violations of numerous AWA standards is arbitrary and capricious, an abuse of discretion, and not in accordance with the law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

132.     The pattern and practice of decisions to annually renew Sawmiller's AWA license also exceeds USDA's statutory jurisdiction and authority, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.     Declare that Defendants acted arbitrarily and capriciously and not in accordance with law, abused their discretion, and exceeded their statutory jurisdiction and authority when they renewed AWA Certificate No. 31-C-0221 in late 2020 or early 2021;

2.     Set aside as unlawful USDA's decision to renew Sawmiller's Class C Exhibitor License, AWA Certificate No. 31-C-0221;

3.     Order Defendants to refrain from renewing Sawmiller's Class C Exhibitor License, AWA Certificate No. 31-C-0221, unless and until Sawmiller demonstrates compliance with the Animal Welfare Act and its implementing regulations;

4.     Award Plaintiff its reasonable attorney fees and costs in this action, and;

5.     Grant Plaintiff such other and further relief the Court may deem just and proper.


Dated: March  9, 2021

Respectfully submitted,


_____

| | |
|---|---|
| Daniel H. Waltz (D.D.C. Bar No. D00424) | Sam Rosenthal (D.C. Bar. No. 329516) |
| ANIMAL LEGAL DEFENSE FUND | NELSON MULLINS RILEY & SCARBOROUGH LLP |
| The Yard, 700 Pennsylvania Ave SE | 101 Constitution Avenue NW, Suite 900 |
| Washington, DC 20003 | Washington, DC 20001 |
| (707) 795-2533 | (202) 689-2868 |
| dwaltz@aldf.org | sam.rosenthal@nelsonmullins.com |

*Attorneys for Plaintiff Animal Legal Defense Fund*